UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TYLER L STEVENS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:22-cv-00660-SEB-CSW |
| ) | |
| JOHN POOR SGT., ) | |
| D. SAXTON OFC., ) | |
| BLANTANT OFC., ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Tyler Stevens, an Indiana Department of Correction ("IDOC") inmate with a history of mental illness and suicidal ideation, alleges that Sgt. John Poor, Officer Kentessa Blanton, and Officer Matthew Saxon were deliberately indifferent to his threats of self-harm, resulting in Mr. Stevens trying to hang himself twice on January 4, 2022. The second time, Officer Saxon sprayed Mr. Stevens with pepper spray. Mr. Stevens alleges that Defendants failed to properly respond to the incident in retaliation for grievances he filed.

Defendants have moved for summary judgment on all claims. For the reasons below, summary judgment is **granted** as to the retaliation claims, **granted** as to the Eighth Amendment claims against Officer Blanton, and **denied** as to the Eighth Amendment claims against Sgt. Poor and Officer Saxon. Dkt. [80].

**I.
Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

1

as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

The summary judgment record contains video of the incident. "[W]here a reliable videotape clearly captures an event in dispute and blatantly contradicts one party's version of the event so that no reasonable jury could credit that party's story, a court should not adopt that party's version of the facts for the purpose of ruling on a motion for summary judgment." *McCottrell v. White*, 933 F.3d 651, 661 n.9 (7th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Stevens and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. Parties

Defendants were at all relevant times correctional officers at Pendleton Correctional Facility ("Pendleton"). Dkt. 25 at 1 (Answer). John Poor was a sergeant, and Matthew Saxon and Kentessa Blanton were officers. *Id.*

Mr. Stevens is an IDOC inmate who at all relevant times was housed in G Cell House, a segregated housing unit at Pendleton. Dkt. 81-1 at 10-11 (Stevens Dep.).

Mr. Stevens has a long history of mental illness which includes being diagnosed with Bipolar Disorder, Attention Deficit Disorder, Attention Deficit Hyperactivity Disorder, Oppositional Defiant Disorder, and Post-Traumatic Stress Disorder. Dkt. 81-1 at 21; dkt. 108-1 at ¶¶ 4-15 (Stevens Decl.); dkt. 108-2 at 1[1] (Medical Records).

Mr. Stevens' mental illness and suicidal ideations began in childhood and have continued to the present day. Dkt. 108-1 at ¶¶ 4-15. His mental illness diagnoses, his inpatient and outpatient treatment, his suicide risk, and his multiple suicide attempts are all well-documented in his medical records and other IDOC records. Dkt. 108-2 at 71 ("chronic risk for suicide is greater than the general population"); 98 ("suicidality is significant"); 88 (noting that Stevens "has a history of hanging himself"); 68 (Stevens found "hanging in his cell" on October 8, 2021).

Mr. Stevens has attempted suicide and self-harm on multiple occasions while incarcerated in IDOC, and he has spent multiple periods of time in suicide watch as a result of his suicide

---

[1] The Court cites to the page number of the PDF rather than the Bates Stamp.

attempts. Dkt. 108-1 at ¶¶ 14-15; dkt. 108-2 at 13, 20-23. Indeed, before the incident relevant to this action, Officer Blanton had found Mr. Stevens hanging in his cell on August 22, 2021. Dkt. 108-4 at 44 (IDOC Records). She cut him down using a J-knife, and he was brought to urgent care for assessment and placed on suicide watch. *Id.* Sgt. Poor was aware that Mr. Stevens had previously been placed on suicide watch and had previously tried to commit suicide. Dkt. 108-13 at 2 (Poor's Response to 2nd Requests for Admission); dkt. 108-8 at 1-2 (Poor's Response to Request for Admissions).

### B. IDOC Suicide Risk Policy

IDOC has a policy titled "Suicide and Self-Injury Prevention" (hereinafter "IDOC Suicide Risk Policy") that "provides guidance regarding the identification and management of [inmates] who are at increased risk for suicide or self-injurious behavior." Dkt. 108-6 at 1. The IDOC Suicide Risk Policy provides:

> **Any employee who:**
>
> 1. Observes an incarcerated individual engaging in self-injurious, suicidal, or unusual behavior which is believed to present a credible risk of self-injury;
>
> 2. Hears an incarcerated individual make suicidal threats;
>
> 3. Is made aware of an incarcerated individual verbal comments expressing a desire or intent to commit suicide; or
>
> 4. Observes an incarcerated individual behaving or displaying any concerning or unusual behavior which for any other reason is believed to demonstrate a credible risk of injury to themselves;
>
> Shall directly observe the incarcerated individual until the Shift Supervisor or designated Health Services staff contacts a [Qualified Mental Health Professional "QMHP"] and the QMHP gives orders for supervision.

*Id.* at 5-6. Further, "in an emergency, when the incarcerated individual is engaging in physical acts of self-injury or there is imminent danger of self-injury, staff must take action to ensure the physical safety of the incarcerated individual." *Id.* at 6.

Defendants all acknowledged familiarity with this policy. Dkt. 108-7 at 1-2 (Blanton's Response to Request for Admissions); dkt. 108-8 at 1-2 (Poor's Response to Request for Admissions); and dkt. 108-9 at 1-2 (Saxon's Response to Request for Admissions).

**C. Events of January 4, 2022**

Around 8:40 p.m. on January 4, 2022, Officers Saxon and Blanton were conducting a head count in the G cell house. Dkt. 81-1 at 11; *see also*, dkt. 81-4 (Video of G Cell House at 9:58−10:40). As they approached Mr. Stevens' cell, he informed them that he "was highly paranoid and suicidal and [he] was going to harm [himself] because [he] thought other people was going to come in and kill [him] in his cell." Dkt. 81-1 at 10; dkt. 81-4 at 10:40−11:05. Mr. Stevens testified that they responded, "Okay. I'm going to go tell the sergeant. If we come back, that means we'll pull you out; if we don't come back, I don't know what to tell you." *Id.* The officers then walked away and proceeded to continue with the count. *Id.* at 11. As they walked away, Mr. Stevens again told them that he needed help and was going to harm himself, but they did not respond. Dkt. 108-1 at ¶ 17. Mr. Stevens heard one of them laugh. *Id.*

Officer Blanton attested that she took Mr. Stevens' statement seriously due to the previous suicide attempt that she had discovered, and that she immediately informed her supervisor Sgt. Poor that Mr. Stevens was suicidal. Dkt. 81-3 at ¶¶ 4-5 (Blanton Aff.); dkt. 81-2 at ¶ 5 (Poor Aff.). Sgt. Poor called the medical department, and someone there told him that Mr. Stevens "had a history of making baseless threats that he would hang himself if he did not get his way." Dkt. 81-2 at ¶ 7.

At some point after they left, Mr. Stevens used a mattress string and ripped bedding sheet to try to hang himself. *Id.* at ¶ 18; dkt. 81-1 at 20. Mr. Stevens intended to end his life. Dkt. 81-1 at 21. Mr. Stevens passed out. *Id.* at 22.

5

The parties dispute what happened next. Mr. Stevens testified that after tying the noose, he woke up on the ground to Officer Saxton, Sgt. Poor, and another guard[2] standing at his cell. *Id.* at 21-22; dkt. 81-4 at 48:03. Sgt. Poor was directing Mr. Stevens to come to the door and cuff up, and as Mr. Stevens began to do so, Sgt. Poor remarked, "Oh, he's okay. He's just looking for attention." Dkt. 81-1 at 23. The officers then walked away from Mr. Stevens' cell, as Mr. Stevens told them that he intended to harm himself again and that he needed help. *Id.* On the other hand, Sgt. Poor attested that he went to Mr. Stevens' cell around 9:18 p.m. and saw that he had a makeshift noose lying on his shoulder that was made out of white cloth. Dkt. 81-2 at ¶ 8. Sgt. Poor did not believe the noose could hold any weight. *Id.* He ordered Mr. Stevens to hand over the noose, and Mr. Stevens complied.[3] *Id.* Dkt. 81-4 at 00:48:00.

After the guards left, Mr. Stevens then made a stronger noose out of nylon string and stronger bedding. Dkt. 81-1 at 24. He again intended to end his life. *Id.* He wrapped one end around his neck and the other on the bars of his cell. *Id.* at 25. At 9:51 p.m., Officer Saxon and Sgt. Poor returned to Mr. Stevens' cell after they heard inmates yelling for staff to come to the range.

The parties again dispute what happened next.[4] Mr. Stevens remembers waking up on "the middle of [his] floor with [his] head busted open and [his] head burning from being maced." *Id.*;

---

[2] Mr. Stevens testified that he believed Officer Blanton was there, but because he was in "such a frenzy" when he woke up, he was not sure. Dkt. 81-1 at 23. The video confirms that three male officers approached Mr. Stevens' cell, and that Officer Blanton was not present at any time after the initial encounter during the evening headcount. *See* dkt. 81-4. Thus, the Court need not credit Mr. Stevens' testimony in this respect. *See McCottrell*, 933 F.3d at 661 n.9.

[3] The video does not resolve the competing versions of this encounter. The guards are seen peering into Mr. Stevens' cell and talking to him for about two minutes, but neither Mr. Stevens nor the inside of the cell is visible. The Court did not see that anything was handed to Sgt. Poor. Dkt. 81-4 at 48:00-50:00. *See Kailin v. Village of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) (collecting cases where video was not dispositive and noting that "[i]t should be considered a rare case where video evidence leaves no room for interpretation by a fact finder.").

[4] Again, the video is not helpful in resolving the dispute because most of the relevant activity occurs within Mr. Stevens' cell, which is not visible. Dkt. 81-4 at 1:21–1:26.

*see also* dkt. 108-2 at 112 (Medical Records, "[A]round 9:51 pm, offender was found hanging in cell, officer (Poor) did manage to cut him down in time[.]"). Sgt. Poor, on the other hand, attested that when he and Sgt. Saxon arrived at the cell, Mr. Stevens had the noose around his neck and was stating that he was going to kill himself but had his feet on the ground. Dkt. 81-2 at ¶ 9. The two officers gave Mr. Stevens multiple orders to stop trying to hurt himself, but Mr. Stevens did not comply, so Officer Saxon applied a one-second burst of OC spray to gain compliance. *Id.* Sgt. Poor then pushed Mr. Stevens away from his cell front because Mr. Stevens had a history of possessing weapons, and Sgt. Poor did not want Mr. Stevens to use a weapon on himself or staff. *Id.* Mr. Stevens, however, attested that he does not have a history of concealing or using weapons, and that while he was cited one time at Pendleton for possessing a weapon, that was many years before the incident at issue here. Dkt. 108-1 at ¶ 30. Further, he attested that Sgt. Poor has never caught him with a weapon and that he has never used a weapon against staff. *Id.*

Mr. Stevens experienced a "stabbing pain" in his neck and shoulder after the incident. Dkt. 81-1 at 26. He continues to suffer from nerve damage in his neck and back after the incident. *Id.* at 32. He has prescription pain medication to help the pinched nerve. *Id.* at 32, 35.

**D. Grievance Activity**

In his Complaint, Mr. Stevens stated, "I believe they left me in my cell because I filed grievances on this shift before [and] I suffer from mental illness, [and] have hung/harmed myself on multiple occasions. Do not feel safe around these C/O's, filed [protective custody] forms…" Dkt. 2 at 3 (Complaint).

Mr. Stevens filed a grievance in which he alleged that Sgt. Poor was poisoning his food, but he never received a response back. Dkt. 81-1 at 28.

## III.
## Discussion

Mr. Stevens raises claims that Defendants were deliberately indifferent to his suicidality; that they used excessive force when they sprayed him with OC spray; and that their actions were retaliatory. The Court discusses each claim.

### A. Retaliation

#### i. Relevant Legal Standard

To survive summary judgment on a First Amendment retaliation claim, a plaintiff must come forward with evidence sufficient to allow a reasonable jury to conclude that: (1) the plaintiff engaged in protected First Amendment activity; (2) he suffered a deprivation that would likely deter future First Amendment activity; and (3) the protected activity was a motivating factor in the defendants' decision to take the allegedly retaliatory action. *Taylor v. Van Lanen*, 27 F.4th 1280, 1284 (7th Cir. 2022). If he does so, the burden shifts to the defendants to show that the deprivation would have occurred even if he had not engaged in protected activity. *Manuel v. Nalley*, 966 F.3d 668, 680 (7th Cir. 2020). If they can make that showing, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual or dishonest. *Id.*

#### ii. Discussion

There is no dispute that filing a grievance is a protected activity. However, Defendants are entitled to summary judgment on the retaliation claim because there is no evidence that Mr. Stevens' grievance was a motivating factor for their actions that evening. "The motivating factor [element] amounts to a causal link between the activity and the unlawful retaliation." *Id.* "Allegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that the defendants knew of the protected speech." *Stagman v. Ryan*, 176 F.3d 986, 999–1000 (7th Cir. 1999). Mr. Stevens testified that he filed a grievance in which he accused Sgt. Poor of

poisoning his food. Dkt. 81-1 at 28. He also acknowledged that he received no response to the grievance. *Id.* This is the extent of the evidence cited by the parties as to Mr. Stevens' protected First Amendment activity. There is no evidence that Sgt. Poor or the other defendants knew about the grievance. *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (non movant receives the "benefit of reasonable inferences from the evidence, but not speculative inferences in his favor" (cleaned up)). Thus, Defendants are entitled to summary judgment on the First Amendment retaliation claim.

### B. Deliberate Indifference to Suicidality

#### i. Relevant Legal Standards

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

"[S]uicide is an objectively serious medical condition, . . . [and] prison officials cannot intentionally disregard a known risk that an inmate is suicidal." *Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020). The parties agree that there is a dispute of material fact with respect to whether Mr. Stevens' suicidal ideation, threats of suicide, and suicide attempts were objectively serious.

9

*See* dkt. 110 at 2 (Defendants conceding in their reply that there is a genuine dispute of material fact with respect to the first prong).

To avoid summary judgment, then, the record must allow a reasonable jury to conclude that Defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Stevens'] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). In cases involving suicide or attempted suicide, "the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk. This requires more than mere or gross negligence, but less than purposeful infliction of harm." *Lisle v. Welborn*, 933 F.3d 705, 716−17 (7th Cir. 2019) (cleaned up).

Further, "[v]iolation of a prison policy *alone* does not violate the Constitution or suggest deliberate indifference." *Schroeder v. Sawall*, 747 F. App'x 429, 431 (7th Cir. 2019) (citing *Lewis v. Richards*, 107 F.3d 549, 553 n.5 (7th Cir. 1997) and *Langston v. Peters*, 100 F.3d 1235, 1238 (7th Cir. 1996)) (emphasis added). However, violation of a prison policy may be probative evidence that a defendant acted with deliberate indifference to a serious risk of harm. *See, e.g., Estate of Clark v. Walker*, 865 F.3d 544, 547−49, 553 (7th Cir. 2017) (noting that mental health professional's failure to follow suicide protocol and decision to do nothing was sufficient evidence to defeat summary judgment).

    ii.    **Officer Blanton**

Officer Blanton's only involvement in the evening's events was her encounter with Mr. Stevens at his cell door during count. With respect to this encounter, it is undisputed that neither Officer Blanton nor Officer Saxon followed the IDOC Suicide Risk Policy. That is, upon

hearing Mr. Stevens' request for help on the basis that he was feeling suicidal at that time, they did not "directly observe the incarcerated individual until the Shift Supervisor" contacted a mental health professional. Dkt. 108-6 at 5−6. Instead, they continued conducting head count. Dkt. 81-1 at 10. But it is also undisputed that Officer Blanton immediately informed her supervisor Sgt. Poor about Mr. Stevens' threats of self-harm, and that he contacted the medical department who advised him that Mr. Stevens was using suicidal threats as a form of manipulation. Dkts. 81-3 at ¶¶ 4−5; dkt. 81-2 at ¶ 5.

Officer Blanton's participation in the events ended at this point. That is, she heard Mr. Stevens' threats of suicide, she informed her supervisor, and he contacted the mental health department. The mental health department did not tell the officers that Mr. Stevens should be put on suicide watch. Though direct observation of Mr. Stevens may have prevented his first suicide attempt, Officer Blanton's actions of trying to obtain help for him and deferring to the medical department's judgment do not evince deliberate indifference. *See Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) ("We have long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment."). Her failure to follow the IDOC Suicide Risk Policy perfectly amounts to no more than negligence. *Lisle*, 933 F.3d at 717. Accordingly, Officer Blanton is entitled to summary judgment on the Eighth Amendment deliberate indifference claim and the Eighth Amendment excessive force claim (as she was not present when the use of force incident occurred).

      iii.    **Sgt. Poor and Officer Saxon**

Disputes of material fact do, however, preclude granting summary judgment in favor of Sgt. Poor and Officer Saxon on the Eighth Amendment risk-of-suicide claim. When the officers

returned to Mr. Stevens' cell, he had tried to harm himself, albeit with a noose made out of thin materials. There is no evidence that the officers followed the IDOC Suicide Risk Policy at this time, nor is there evidence that Sgt. Poor tried calling a mental health professional for further guidance. A jury could reasonably conclude that they were deliberately indifferent by doing no more than collecting the noose and then walking away.

Defendants argue they are entitled to summary judgment based on the affirmative defense of qualified immunity. "[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "To overcome the defendant's invocation of qualified immunity, [a plaintiff] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013). This "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton,* 483 U.S. 635, 646 (1987)).

Defendants' argument that they are entitled to qualified immunity consists of two sentences:

> Here, Defendants are entitled to qualified immunity because they did not act plainly incompetent or in knowing violation of the law. Defendants are unaware of any case law which requires a prison official to immediately remove an inmate from their cell after a superficial, insincere suicide threat who has a history of making suicide threats to manipulate staff.

Dkt. 82 at 11.

It is "well established that inmates have the right to be free from deliberate indifference to [the risk of suicide] while in custody." *Lisle*, 933 F.3d at 716. Defendants' qualified immunity argument therefore hinges on their contention that Mr. Stevens' threat of suicide was insincere. But in their reply, Defendants acknowledge a dispute of fact as to the sincerity and seriousness of Mr. Stevens' threat of self-harm. Dkt. 110 at 2. Summary judgment cannot be granted based on qualified immunity where there are disputes of material fact. *See Ferguson v. McDonough*, 13 F.4th 574, 584 (7th Cir. 2021). Thus, neither Sgt. Poor nor Officer Saxon is entitled to qualified immunity at this juncture.

### C. Excessive Force

#### i. Relevant Legal Standard

The Eighth Amendment protects inmates from cruel and unusual punishment, including excessive force by prison officials. *McCottrell v. White*, 933 F.3d 651, 662 (7th Cir. 2019). This rule does not bar *de minimis* force unless the force is "of a sort repugnant to the conscience of mankind." *Wilkins v. Gaddy*, 559 U.S. 34, 37−38 (2010) (per curiam) (cleaned up). Even if the force applied is not *de minimis*, it remains permissible if used "in a good-faith effort to maintain or restore discipline." *McCottrell*, 933 F.3d at 664 (cleaned up). But malicious or sadistic force—even if it does not cause a serious injury—is prohibited. *Id.* To distinguish between good-faith and malicious force, courts consider several factors, including:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

*Id.* at 663; *see also Whitley v. Albers*, 475 U.S. 312, 321 (1986). Additionally, to survive summary judgment, a plaintiff must present evidence supporting "a reliable inference of wantonness in the

13

infliction of pain." *Whitley*, 475 U.S. at 322.

It is not cruel and unusual punishment to use "mace, tear gas or other chemical agent of the like nature when reasonably necessary to prevent riots or escape or to subdue recalcitrant prisoners." *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984). A prison officer may use small amounts of pepper spray to compel a disobedient prisoner to leave a cell. *Id.*; *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 668 (7th Cir. 2012) (where prisoner had hit his cellmate and refused to comply with order to leave cell, use of pepper spray was justifiable). But "it is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Soto*, 744 F.2d at 1270.

### ii. Discussion

Factual disputes preclude resolution of this claim on summary judgment. As the Court observed above, the video sheds no light on the parties' actions because the inside of the cell is not visible. According to Mr. Stevens' version of events, he was unconscious at the time the OC Spray was deployed. If a jury credited his version, then it could reasonably find that no force was needed, so any use of OC Spray was excessive. *See McCottrell*, 933 F.3d at 667 (finding there was a question of fact about the necessity of force when "there was no ongoing dangerous and volatile situation"). There is also a dispute with respect to whether Mr. Stevens had a history of possessing weapons. If the jury credited Defendants' version of events, then it could reasonably find that the use of the force was reasonable. Given the contradicting versions of what happened within Mr. Stevens' cell, Defendants Poor and Saxon are not entitled to summary judgment on the excessive force claim.

## IV.
## Conclusion

Defendants' motion for summary judgment is **granted in part and denied in part**. Dkt. [80]. The motion is **granted** as to all Defendants on the retaliation claim and **granted** as to Officer Blanton on the Eighth Amendment claims. The motion is **denied** as to the Eighth Amendment claims against Sgt. Poor and Officer Saxon.

**The clerk is directed** to terminate Officer Blanton as a defendant in this action. No partial final judgment shall issue.

The magistrate judge is requested to set this matter for a telephonic status conference to discuss further proceedings.

**IT IS SO ORDERED.**

Date: 8/1/2024

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

TYLER L STEVENS
202315
WESTVILLE - CF
WESTVILLE CORRECTIONAL FACILITY
Inmate Mail/Parcels
5501 South 1100 West
WESTVILLE, IN 46391

All Electronically Registered Counsel

Magistrate Judge Crystal Wildeman